UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| NIA S. LUCAS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-00374-LEW |
| | ) | |
| TOWN OF GOULDSBORO, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

## ORDER ON MOTION TO DISMISS AMENDED COMPLAINT

Plaintiff Nia S. Lucas, pro se, alleges that Defendants, the Town of Gouldsboro, its Chief of Police Jim Malloy, and Sergeant Wayne Robbins deprived her of her constitutional and statutory rights in connection with her effort to access a property she jointly owned with a former domestic partner. The matter is before the Court on the Defendants' Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 16).

## BACKGROUND

The allegations related in Plaintiff's Amended Complaint (ECF No. 15) are accepted as true for purposes of Defendants' Motion to Dismiss. Plaintiff's allegations may also be informed by materials (generally speaking, documents) susceptible of judicial notice, of public record, or referenced and relied upon to support the plaintiff's cause. *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020). Plaintiff is also entitled to the benefit of reasonable inferences that arise from her factual allegations. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Sanchez v.*

*Pereira–Castillo*, 590 F.3d 31, 41 (1st Cir. 2009).  According to Plaintiff, Defendants are liable to her on her claims based on the following allegations.

Plaintiff identifies herself as a Black woman.  She and Alexander Miller are former domestic partners with children in common.  Plaintiff and Mr. Miller are also joint tenants of a "Sandpiper Property" located at 49 Sandpiper Road in Gouldsboro, Maine.  Mr. Miller is a White male.

As alleged, on or about May 28, 2025, in Maryland, Mr. Miller stalked Plaintiff, burglarized her home, and absconded with her two dogs to the Sandpiper Property.  Mr. Miller would soon be subject to a Maryland arrest warrant based on his conduct.  Plaintiff contacted Defendant Sergeant Wayne Robbins at the Gouldsboro Police Department, by phone, and informed him of Mr. Miller's conduct.  Thereafter, she filed a written report. Based on the information and the Maryland warrant, Sergeant Robbins conducted an arrest of Mr. Miller and recovered Plaintiff's dogs.  On June 4, 2025, Sergeant Robbins emailed Plaintiff to inform her of these developments.

On June 9, 2025, Plaintiff informed Sergeant Robbins by e-mail that she would be going to the Sandpiper Property to retrieve her belongings.  Sergeant Robbins e-mailed her back and advised that "any Protection Orders or Court Orders regarding retrieval of property at the residence, will have to be filed in a Maine Court for us [the Gouldsboro Police Department] to be able to enforce them."  Am. Compl. ¶ 22.  Plaintiff alleges that Sergeant Robbins was purposefully misinforming her about the legal requirements for her to access the Sandpiper Property to recover her personal items.

On June 16, 2025, Plaintiff traveled with her minor children toward Maine from her home in Maryland to recover the dogs from a Maine shelter.  On the way, Plaintiff stopped in Connecticut and, on June 17, filed in a Connecticut court for a protective order against Mr. Miller.  The court issued Plaintiff a temporary protective order on that date.  Also, as of that date Mr. Miller was detained in a Maryland prison facility, so Plaintiff intended to go to the Sandpiper Property to retrieve her personal property.  She notified Sergeant Robbins of her plan.  He informed her that if she went to the Sandpiper Property she would be arrested and jailed.  Plaintiff called off her visit to the Sandpiper Property due to the threat of arrest.

On June 23, 2025, Plaintiff obtained a protection-from-abuse order (PFA) in Maine District Court against Mr. Miller.  Evidently, by that date, Mr. Miller was back in Maine and staying in the Sandpiper Property because, as alleged, Sergeant Robbins served Mr. Miller at that location, serving notice of both the Maine PFA order and the temporary Connecticut protective order and hearing.

When making his return of service, Sergeant Robbins sent a return of service to Maine District Court but failed or neglected to provide a return to the Connecticut court.  When Plaintiff requested that the Gouldsboro Police Department provide a separate return of service to the Connecticut court, as alleged, the Department "outright refused service."  Am. Compl. ¶ 34.  On June 30, Plaintiff emailed Gouldsboro Chief of Police James Malloy and Sergeant Robbins to request that they fax a return of service to the Connecticut court in advance of a hearing the next day.  She also communicated her request, in part, as a request under the Maine Freedom of Access Act.  Plaintiff has not alleged that she had any

cause to be in Connecticut other than to pursue another protective order. Although Mr. Miller appeared at the hearing in Connecticut, the court continued its hearing due to the lack of a return of service and Miller's refusal to waive service.

On July 8, 2025, Plaintiff went to the Gouldsboro Town Office and requested assistance in retrieving items from the Sandpiper Property. She was directed to speak with Chief Malloy, who accused Plaintiff of playing games and warned her that she would be arrested if she went to the Sandpiper Property. Implicitly, that caution amounted to the denial of her request for an escort. Plaintiff indicated that she wished to make a police report concerning a shotgun she owned that Mr. Miller did not return to her. She was advised to come to the Town Office to make her report but despite doing so and placing multiple calls no member of the Department appeared to accept her report. That same evening, Chief Malloy called Plaintiff concerning her request for an escort. He stated that he had checked with the District Attorney and that he was advised "not to take sides." *Id.* ¶ 46. He indicated that she would not be arrested for going to the Sandpiper Property, but also that she would not receive an escort and that, should she go alone, "whatever happens happens." *Id.* Chief Malloy warned that if something should "go sideways," someone would "be liable." *Id.* Based on these remarks, Plaintiff feared accessing her home on her own and did not do so.

At a hearing in Maine District Court on July 10, 2025, the court informed her that no court order prevented her from entering the Sandpiper Property. Still, dissuaded by Chief Malloy's remarks, Plaintiff did not attempt to enter the property on her own.

Plaintiff filed this civil action on July 17, 2025.

Meanwhile, Plaintiff abandoned the Connecticut proceeding after two more continuances because she did not receive a timely return of service from the Goldsboro Police Department. Plaintiff even complained to the Gouldsboro Town Manager and requested renewed service of the Connecticut process from the Department. No response was received until early August 2025.

Plaintiff separately requested an escort from both the Maine State Police and the Hancock County Sheriff's Office, but they informed her that it was Gouldsboro's obligation and that the Gouldsboro Police Department had indicated that she was not to have access to the Sandpiper Property.

Plaintiff alleges that Defendants caused her extreme emotional and physical stress as a result of their actions and omissions, including the threat of arrest, the denial of an escort, the provision of misinformation about court order requirements, the refusal to appear to accept her in person report, and the refusal to perform service of process or make a return to the Connecticut court. She also alleges that these actions and nonactions were motivated by racial bias, gender bias, and animosity toward her petitioning activity.

## DISCUSSION

Plaintiff asserts four claims: Count I for deprivation of rights secured by the First and Fourteenth Amendments to the U.S. Constitution, made actionable by 42 U.S.C. § 1983; Count II asserting municipal liability for the same; Count III for interference with her right to hold and enjoy property, in violation of 42 U.S.C. § 1982; and Count IV for related violations of the Maine Civil Rights Act, 5 M.R.S. §§ 4682(1-A) & 4684-A. Defendants argue that Plaintiff has failed to state a plausible claim in any of her four counts.

Alternatively, the individual defendants argue that qualified immunity shields them from liability. I take up their arguments by count, leaving for last the invocation of qualified immunity.

To avoid dismissal, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Because Plaintiff proceeds pro se in this matter, her filings are "to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). As interpreted by the Supreme Court, the pleading standard established under Rule 8 requires only that Plaintiff's Amended Complaint provide "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plausible claim involves only a modest "nudge" beyond what would otherwise be described as a mere conceivable claim. *Id.* Thus, when alleging the existence of improper motivations such as racial or sex-or-gender bias, Plaintiff does not need to allege facts that provide strong evidence of discrimination and can overcome a motion to dismiss based on facts sufficient to give rise to a plausible inference. *Garayalde-Rijos v. Mun. of Carolina*, 747 F.3d 15, 24 (1st Cir. 2014); *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 14-15 (1st Cir. 2011).

## A.    Count I—§ 1983

Count I gathers together three different claims under the umbrella of 42 U.S.C. § 1983. "[T]o state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." *Cruz–Erazo v. Rivera–Montanez*, 212 F.3d 617, 621 (1st Cir. 2000). The parties do not dispute Defendants Malloy and Robbins acted under

color of law as police officers.  Plaintiff alleges that the rights Defendants deprived her of are protected by (1) the Fourteenth Amendment's Equal Protection Clause, (2) the First Amendment's Petition Clause, and (3) an amalgamation of the provisions found in the First Amendment and the Fourteenth Amendment that coalesce to protect the right to access the courts.  Am. Compl. ¶¶ 72-92.

### 1.  Equal Protection

Plaintiff alleges that Defendants subjected her to selective enforcement or selective treatment ("discriminatory law enforcement") in violation of the Equal Protection Clause of the Fourteenth Amendment.  The selectivity she has in mind is in relation to the treatment of her right to access the Sandpiper Property as compared to Mr. Miller's right, free from the threat of arrest, and to have equal access to police services.  She says that she received disfavored treatment due to racial and gender bias, since she is a Black woman. *Id.* ¶¶ 74-80.

The Equal Protection Clause provides:  "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Under its auspices, similarly situated persons must be treated alike when it comes to state action. *Hewes v. Pangburn*, 162 F.4th 177, 195 (1st Cir. 2025).  To state an equal protection claim of this kind, a plaintiff must provide allegations sufficient to support a plausible, non-speculative conclusion (1) that the defendants subjected her to selective treatment or enforcement, and (2) that the selective treatment or enforcement was based on one or more impermissible considerations such as race, sex, or gender.  *Id.*

Defendants argue that the comparison between Plaintiff and Mr. Miller is not appropriate because she and Mr. Miller were not in the same position, since Mr. Miller was then in residence at the Sandpiper Property and she was not, and because the two were opposing parties in PFA proceedings. Motion at 7-8 (ECF No. 16). Defendants also argue that the allegations do nothing to reveal that Defendants acted out of hostility or based on an impermissible consideration. *Id.* at 8. Defendants note that Sergeant Robbins actually arrested Mr. Miller, whereas he never arrested Plaintiff. *Id.*

Plaintiff responds that the poor treatment she received, including the threats of arrest and the later stonewalling of her effort to obtain an escort onto the Sandpiper Property and the return of Connecticut process, are so "deeply troubling" that the existence of an impermissible consideration is a plausible finding. Opp'n at 1-3 (ECF No. 20). As to being similarly situated, she argues that she and Mr. Miller were "identical" because they were joint tenants with an equal right to access the Sandpiper Property, making the threat of arresting Plaintiff rather than inconveniencing Mr. Miller a form of selective enforcement. *Id.* at 5.

While Defendants may perhaps have a point that, at least from their perspective, Plaintiff and Mr. Miller should not be considered similarly situated because Mr. Miller was in residence at the Sandpiper Property and Plaintiff was seeking entry and the two were clearly in opposition to one another, the allegations indicate that Defendants intimidated Plaintiff with the threat of arrest even when the Sandpiper Property was vacant due to Mr. Miller's detention in Maryland. Moreover, as alleged, Chief Malloy acknowledged that

Defendants had taken sides on the issue. I conclude that these facts present a sufficient allegation of selective treatment.

The existence of an impermissible consideration such as a bias based on race, sex, or gender is, similarly, a close call. For example, as Defendants suggest, it certainly is plausible that the poor treatment that befell Plaintiff would have befallen whomsoever happened to be the joint tenant not currently in possession of the property, regardless of race, sex, or gender considerations. However, Defendants' threat to arrest Plaintiff if she entered the property when Mr. Miller was under arrest in Maryland, the Chief's apparent acknowledgement that a side had been taken in the matter, and the alleged refusal to serve and protect Plaintiff as an ordinary member of the public are difficult to simply brush away when considering competing plausible inferences. This incongruity strikes me as an adequate basis to find it plausible that an impermissible consideration was at work. I make this assessment strictly in the context of the forgiving standard that applies to a motion to dismiss, which entitles Plaintiff to the benefit of all reasonable inferences that might be drawn in her favor. Other explanations are also plausible.

### 2. First Amendment Retaliation and Interference

Plaintiff alleges that Defendants retaliated against her for exercising her First Amendment right to petition the government by threatening arrest if she exercised her lawful right to enter her home, by refusing to provide civil standby or escort, by refusing to take and process reports of stolen property, and by failing or refusing to provide return-of-service documentation that impeded Plaintiff's ability to obtain timely judicial relief.

9

She claims that Defendants grew hostile to her because she sought court protection, sought accountability from Defendants, and asserted her rights.  Am. Compl. ¶¶ 81-86.

For this claim, Plaintiff must plausibly allege that (1) she "engaged in constitutionally protected [political or speech or petition] conduct," (2) she was "subjected to an adverse action" by Defendants, and (3) her "protected conduct was a substantial or motivating factor in the adverse action." *Falmouth Sch. Dep't v. Doe ex rel. Doe*, 44 F.4th 23, 47 (1st Cir. 2022).  An adverse action is an action that would deter a person of ordinary firmness from engaging in protected conduct.  *Delaney v. Town of Abington*, 890 F.3d 1, 8 (1st Cir. 2018).

Defendants argue that Plaintiff fails to allege any actual chilling of her speech activity.  Mot. at 10.  Defendants also assert that Plaintiff's claim that they sought to retaliate against protected activity is implausible.  They also note that Sergeant Robbins in fact served process on Mr. Miller, even if a return of service to the Connecticut court was not timely for Plaintiff's purposes.  In response, Plaintiff argues that her conduct was protected and consisted in her report of a crime, requests for service of process/return of service, petition under Maine's Freedom of Access Act, and the filing of this case.  Opp'n at 16.

I find that Plaintiff's conduct plausibly qualified as protected conduct, since she petitioned the Defendants to assist her in connection with her grievances against another individual by means of an escort onto the Sandpiper Property, filed her FOAA request with the Town, and commenced this civil action.  Although Plaintiff's early announcement of an intention to go to the property on her own cannot itself be reasonably categorized as

10

protected speech, still, it appears to be a reasonable interpretation of the pleadings that her statements included a demand for escort that resulted in the threat of arrest, a rather plain adverse action. Adverse action could also be found in the denial of services. One reading of the Amended Complaint is that Plaintiff was essentially stonewalled or ignored by Defendants. That development might also explain the Chief's comment that the Department had taken sides against her.[1] For these same reasons, the allegations of a retaliatory motive are similarly plausible.

### 3. Denial of Access to the Courts

Plaintiff alleges that Defendants violated her right of access to the courts by refusing to provide a return of service to the Connecticut court. She alleges that impairment of her access to the detriment of a "nonfrivolous legal claim" is all she must allege to state this claim. Am. Compl. ¶ 88. Defendants argue that there is no plausible claim because they made a return of service on August, 5, 2025, and because the action in Connecticut did not concern a fundamental right. Mot. at 11-12.

Defendants' fundamental right argument is not persuasive. Cases that require a showing of a non-frivolous claim involving a fundamental right involve access claims brought by prisoners. Prisoners' rights are reduced by virtue of their incarceration. Consequently, when prisoners allege the denial of access to the courts they are required to demonstrate actual harm to a claim involving a fundamental right. *Lewis v. Casey*, 518 U.S. 343, 354-55 (1996). This is not a prisoner case.

---

[1] Based on communications made by Mr. Miller, Plaintiff alleges that she learned that Mr. Miller was aware that the Gouldsboro Police Department had ordered Plaintiff not to go to the Sandpiper Property.

11

Defendants' remaining argument is that Plaintiff suffered no impairment to her access because service was eventually returned. In a time-sensitive context such as a protective order proceeding, I am not persuaded that "getting around to it eventually" is an ironclad defense at the pleading stage.[2] To be sure, a more thorough examination of the facts may reveal that the timing of the return of service was not truly detrimental, but for present purposes the request for dismissal is denied.

## B.    Count II—§ 1983—Municipal Liability

In Count II, Plaintiff presses the claims recited in Count I against the Town of Gouldsboro. She alleges that the claims resulted from an official policy, custom, or practice maintained by the Town. In support of her claim, she observes that she escalated to the Town Manager her demand for service of process and a return of process and that the Chief of Police was directly in the chain of command for the threat of her arrest and the denial of her requested services. She further attributes her claims to the Town based on

---

[2] Plaintiff's denial of access claim must reveal "loss of an opportunity to seek some particular order of relief," *Christopher v. Harbury*, 536 U.S. 403, 414 (2002), which I understand to be her desire for an enduring order of protection from a Connecticut court (rather than a mere temporary order). This § 1983 claim is, therefore, inherently "ancillary to" Plaintiff's claim for a protective order from the Connecticut court, *id.*, meaning the viability of the ancillary claim is a required showing, to include, presumably, proof of personal jurisdiction over Mr. Miller in the Connecticut forum, as well as an actual "lost remedy," *id.* at 416. Additionally, Plaintiff will need to "identify a remedy that may be awarded as recompense" in this action that is "not otherwise available in some suit that may yet be brought," *id.*, which probably entails ruling out remedies otherwise achieved before bringing this suit. I am concerned that this claim is deficient considering that, even though the Connecticut proceedings could not proceed beyond a temporary protective order without return of the proof of service, since Mr. Miller would not waive service, Plaintiff had, nonetheless, secured timely relief in Maine, a jurisdiction with unquestioned jurisdiction over Mr. Miller's person. The order issued in Maine (or, for that matter, a final protective order issued in Maryland) could have been registered in Connecticut, even without notice to Mr. Miller, *see* 18 U.S.C. § 2265, making the pursuit of the Connecticut protective order potentially superfluous in terms of demonstrating actual harm.

the Town Manager's alleged failure to take steps on her behalf when she pressed her concerns with him.  Am. Compl. ¶¶ 93-99.

Defendants argue that the Town is not liable based on Plaintiff's allegations because the Town is not responsible for the on-the-ground, on-the-spot decisions made by its police chief or its police sergeant or even its town manager.  They argue that there is no allegation to support a plausible finding that the Town was the moving force behind the alleged violations.  Mot. at 14-17.  They also point to the fact that Chief Malloy consulted with a district attorney and withdrew his opposition to Plaintiff's entry to her property and that the Town Manager investigated Plaintiff's reports of non-action.  Mot. at 17.

Plaintiff argues that her allegations support a finding that Gouldsboro lacked a constitutionally adequate policy for handling property retrieval in the context of domestic violence disputes, even though Maine law requires that municipalities maintain such policies.  Opp'n at 20 (citing 25 M.R.S. § 2803-B(1)(D)(3)).[3]  Plaintiff also argues that Chief Malloy's exercise of his discretion in these matters has the weight of a municipal policy because he is, in effect, the final arbiter of access to such services in the absence of a municipal policy that guides his actions.  *Id.* at 20.  Plaintiff also argues that the response she received after complaining to the Town Manager was too anemic to exonerate the Town.  *Id.*

To the extent the Town Manager's involvement is addressed in the parties' municipal liability arguments, it is in the context of whether he acted in a way that

---

[3] To this, I observe only that a violation of state law is not necessarily a violation of federal law.

demonstrates that the Town Manager supervises the Chief of Police in regard to service-related concerns.  I am not persuaded that the pleadings offer a reliable means of assessing that contention and therefore deny the request for dismissal based on what little is presently known about the Town Manager's involvement.

Instead, for present purposes, I will focus on the fact that the alleged denial of an escort, threat of arrest, refusal of process-related services, and refusal of a request to present a police report were all matters plausibly subject to the exercise of final discretionary authority by the Gouldsboro Chief of Police.  The liability of a municipality under § 1983 depends on the existence of an official municipal policy or custom that can be said to have been the moving force behind an alleged constitutional violation.  *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 690-91 (1978).  But when a single municipal officer is imbued with the authority to establish municipal policy and custom on a given topic, "under appropriate circumstances" his or her decision in an individual case will amount to an official policy statement.  *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986).  For example, where a chief of police has the final authority to make a hiring determination, the determination can be freighted with policy-making implications.  *See Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008).  For present purposes, Plaintiff's allegations are sufficient to state a claim for municipal liability because it is plausible that Chief Malloy had final authority to establish a policy concerning the provision of police services to Plaintiff.

**C.    Count III—42 U.S.C. § 1982—Race-Based Interference with the Right to Hold and Enjoy Property**

In Count III, Plaintiff alleges that Defendants interfered with her right to hold and enjoy property in violation of 42 U.S.C. § 1982 by threatening to arrest her if she went to the Sandpiper Property to retrieve her personal belongings.  Am. Compl. ¶¶ 100-107. Section 1982 guarantees all citizens "the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 336 (2020) (quoting 42 U.S.C. § 1982).  Such a claim is stated if the allegations plausibly relate that the plaintiff was deprived of the enjoyment of property rights or suffered impairment of property interests because of color or race.  *Id.*; *City of Memphis v. Greene*, 451 U.S. 100, 122 (1981).

Defendants argue that even if the threat of arrest interfered with Plaintiff's property rights, the allegations do not support a plausible finding that the warning was racially motivated.  Mot. at 17.  For the reasons related above in connection with Defendants' challenge to Count I, I find that Plaintiff's allegations are sufficient to make the necessary inference plausible.

**D.    Count IV—Maine Civil Rights Act**

In Count IV, Plaintiff incorporates by reference her allegations concerning the denial or deprivation of federal rights and reasserts them as claims for deprivation of rights secured to her under Maine law, specifically, the Maine Civil Rights Act (MCRA), 5 M.R.S. §§ 4682(1-A) & 4684-A.  Am. Compl. ¶¶ 108-114.  Defendants challenge Count IV similarly, by incorporating their arguments in opposition to Plaintiff's federal claims.

15

Mot. at 18. I follow the parties' lead in this. "The [Maine Civil Rights Act], which provides a general remedy for violations of federal and state constitutional and statutory rights, is 'patterned' after Section 1983. As such, disposition of a claim under Section 1983 controls a claim brought under MCRA." *Jackson v. Town of Waldoboro*, 751 F.Supp.2d 263, 275 (D. Me. 2010) (citations omitted). Consequently, this claim, too, will proceed.

### E.    Qualified Immunity

Finally, Defendants Malloy and Robbins interpose qualified immunity. Mot. at 12-14. The qualified immunity doctrine shields law enforcement officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."). This expansive doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The defensive shield of qualified immunity has two layers. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the context of a motion to dismiss, the first layer is merely an issue of whether the complaint's allegations state a plausible constitutional claim against the officers in question. *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015). If so, or if the plausibility question is difficult to answer, the second layer will still shield the defendants if the constitutional claim is premised on a

legal theory or principal that was not "clearly established" on the date of the underlying incident. *Id*. In effect, unless the law was clearly established at the time, the qualified immunity doctrine holds that it is not fair to infer or presume that the defendants would have understood that their actions or inactions resulted in the deprivation of a constitutional right. *Id*. (citing *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 610 (2015) (noting the need for existing precedent that "placed the … constitutional question beyond debate")).

Based on the preceding discussion, Plaintiff's claims penetrate the first layer of the qualified immunity shield because they state plausible constitutional claims. As for the second layer, which calls for an inquiry into the clarity of the governing law in relation to the circumstances alleged, I find that Plaintiff penetrates this layer as well, at this stage, since her claims allege plausible, purposeful discrimination. Purposeful discrimination is clearly proscribed by law, and qualified immunity does not provide protection to those who knowingly violate the law. *Malley*, 475 U.S. at 341. To be clear, this does not amount to a finding that Chief Malloy or Sergeant Robbins knowingly violated the law, only that Plaintiff has plausibly alleged as much under the relatively lax standard that applies to a motion to dismiss and, consequently, the application of the qualified immunity doctrine cannot be determined at this stage of the proceedings.

CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 16) is DENIED.

17

SO ORDERED.

Dated this 1st day of June, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge